## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JACQUELYNNE HERNANDEZ,

     **Plaintiff,**

v.                                  **No. 1:22-cv-00459-JCH-JMR**

**NATIONAL TECHNOLOGY AND
ENGINEERING SOLUTIONS OF
SANDIA, LLC, a wholly owned subsidiary
of Honeywell International, Inc. dba
SANDIA NATIONAL LABORATORIES,**

     **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jacquelynne Hernandez, D.Eng., worked for Defendant National Technology and Engineering Solutions of Sandia, LLC ("Sandia"). An internal ethics investigation determined that Dr. Hernandez violated Sandia's policies. Sandia offered Dr. Hernandez the choice between retirement and termination. She chose retirement, but later sued Sandia for race, color, and age discrimination. Sandia then filed *Defendant's Motion for Summary Judgment* (ECF No. 26). The Court concludes that Sandia's motion should be granted, and judgment will be entered in favor of Sandia on all counts.

## I.    STANDARD

The Court begins with the legal standard because it affects how the Court construes the facts. Summary judgment is appropriate only if no genuine dispute of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. And an issue is genuine if the evidence might lead a reasonable jury to return a verdict for the nonmovant. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

The moving party first bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must "come forward with specific facts showing" that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

Both parties rely on affidavits. For the Court to accept facts from the affidavits, they must be "based on personal knowledge and [must set] forth facts that would be admissible in evidence." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (alteration in original) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002)). The Court will disregard allegations based solely on "mere speculation, conjecture, or surmise." *Id.* (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). So too, the Court will disregard "conclusory and self-serving affidavits." *Id.* (quoting *Garrett*, 305 F.3d at 1213).

## II.    BACKGROUND

Dr. Hernandez is an African American woman with black skin color who was born in 1958. (Charge of Discrimination 1, Def.'s Ex. R, ECF No. 26-2.) She worked for Sandia from December 1989 until her retirement in June 2020. (Pl.'s Dep. 19:24 to 20:02, 25:23 to 26:1, Def.'s Ex. A, ECF No. 26-2.) In 2015, Dr. Hernandez worked in the Energy Storage Technology and Systems ("ESTS") Department. (*Id.* at 26:18-20.) That year, Sandia hired Babu Chalamala as ESTS's

Manager.[1] (Chalamala Decl. ¶ 1, Def.'s Ex. B, ECF No. 33-1.) Dr. Chalamala became Dr. Hernandez's direct supervisor. (Pl.'s Dep. 28:21 to 29:10.) Dr. Chalamala reported to Charles Hanley, and Mr. Hanley reported to Carol Adkins (*Id.* at 56:23 to 57:21.)

### A.    Dr. Chalamala's Supervision of Dr. Hernandez

Dr. Hernandez agreed that her relationship with Dr. Chalamala was initially "pretty good." (Pl.'s Dep. 58:18-21.) In November 2017, however, their relationship began to "unravel." (*Id.* at 58:22 to 59:02.) Dr. Hernandez attributes the relationship's decline to her pursuit of a doctorate in electrical energy storage policy at George Washington University. (*Id.* at 58:08 to 62:09; Pl.'s Decl. ¶ 66, Pl.'s Ex. 1, ECF No. 28-1.) According to Dr. Hernandez, Dr. Chalamala told her, "You will not have a place in this organization [upon getting the degree]." (Pl.'s Dep. 77:12-13.) Dr. Chalamala's explanation for this comment, according to Dr. Hernandez, was that "he had no intentions of having anyone as an energy storage policy . . . expert or staff member in his group" and "that [such a policy expert or staff member] would not be a fit, because he wanted to do [research and development]." (*Id.* at 79:03-04.)

In February 2018, Mr. Hanley submitted a letter of support for Dr. Hernandez to participate in the Sandia University Part Time ("UPT") Special Degree Program. In this competitive internal program, Sandia pays admitted participants a full-time salary while they attend graduate school

---

[1] Dr. Hernandez identified that a notary public did not sign three of Sandia's affidavits—by Babu Chalamala (Def.'s Ex. B, ECF No. 26-2), Michael Miller (Def.'s Ex. H, ECF No. 26-2), and Carol Adkins (Def.'s Ex. N, ECF No. 26-2). Dr. Hernandez also identified that these affidavits provided the foundation for three of Sandia's other exhibits—the Report of Investigation (Def.'s Ex. L, ECF No. 26-2), Discipline Matrix (Def.'s Ex. O, ECF No. 26-2), and Case Review & Approval Form (Def.'s Ex. P, ECF No. 26-2). Dr. Hernandez stated that she would file a motion to strike these six documents. (Pl.'s Resp. 1-7, ECF No. 28.)

Sandia responded with a notice of errata, attaching declarations from Dr. Chalamala, Mr. Miller, and Dr. Adkins that cured the alleged deficiencies. Dr. Hernandez agreed that the resubmissions resolved the issues she identified. (Def.'s Notice of Errata ¶ 2, ECF No. 33.)

and work part-time for Sandia. (Def.'s Mem. Br. 3, ¶ 7 n.1, ECF No. 26-1.) The letter states, in part,

> The skills that Jaci will develop through this program will be broadly applicable across Sandia's several mission areas. While we continue to focus our group's efforts more strategically on technology research and development for energy systems, it is my hope that upon completion, Jaci can find a suitable position that utilizes these new skills to Sandia's advantage, and our management team will help her in her search for that position – whether in [her ESTS division] or elsewhere.

(Hanley Letter, Def.'s Ex. C, ECF No. 26-2.) Dr. Hernandez was ultimately denied admission to the Sandia UPT Special Degree Program—a decision not made by Dr. Chalamala. Still, Dr. Chalamala approved Dr. Hernandez to receive tuition reimbursement. (Pl.'s Dep. 96:06 to 97:15.)

According to Dr. Chalamala, Mr. Hanley's letter was intended to show that ESTS pivoted to research and development, so Dr. Hernandez's energy-policy degree would not help ESTS. Dr. Chalamala insists that the letter was not meant to suggest that he would remove Dr. Hernandez from ESTS after she finished her degree. (Chalamala Decl. ¶ 3.) But in Dr. Hernandez's view, this letter shows that her position was at risk. (Pl.'s Decl. ¶ 66.) Also according to Dr. Hernandez, she sought a new placement at Sandia after Dr. Chalamala told her that she would lose her position in ESTS after finishing her degree. She alleges that Dr. Chalamala blocked four transfer attempts. (*Id.* ¶¶ 66-71.) Viewing these facts in the light most favorable to Dr. Hernandez, the Court accepts that the letter shows the vulnerability of Dr. Hernandez's position.

Despite Mr. Hanley's and Dr. Chalamala's stated focus on research and development, Dr. Hernandez suggests that ESTS remained interested in energy policy. According to Dr. Hernandez, Sandia hired a white man, William McNamara, in August 2019 to be an electrical energy storage policy expert. (*Id.* Second ¶ 75.) Dr. Hernandez describes that Mr. McNamara was "to perform the work for which I was training and the work where I had subject matter expertise in energy policy." (*Id.*) Sandia qualifies Dr. Hernandez's allegations, stating that Mr. McNamara was hired for

analysis and not policy. (Def.'s Reply 4, ECF No. 34.) In her deposition, however, Dr. Hernandez testified that the line between policy and analysis is not always clear: "You can have some aspect of policy that is analysis." (Pls. Dep. Additional Pages 130:15-16, Def.'s Ex. U, ECF No. 34-1.) Sandia also qualified Dr. Hernandez's reference to Mr. McNamara by highlighting that Mr. McNamara was hired as a limited-term employee, so his job was limited in term and not subject to annual renewal or nonrenewal. (*Id.* at 135:12 to 136:06.) Dr. Hernandez, by contrast, was a regular employee, so she was hired for an indefinite term. (*Id.* at 139:15 to 140:02.) And she testified that she would not have applied for a limited-term position. (*Id.* at 141:05-08.) Viewing these facts in the light most favorable to Dr. Hernandez, the Court accepts that Sandia hired someone to do energy-policy work for ESTS around the time Dr. Hernandez finished her degree.

Finally, Dr. Hernandez asserts that Dr. Chalamala treated her differently than two younger employees, David Rosewater and Ben Schenkman. Dr. Hernandez alleged that Drs. Rosewater and Schenkman each worked part-time while pursuing their doctorate degrees, but she worked full-time while pursuing her doctorate. (Pl.'s Dep. 121:18 to 125:23, 307:03 to 308:14.) Dr. Chalamala confirmed that he approved Dr. Rosewater to work part-time while pursuing his Ph.D—but Dr. Chalamala gave his approval after Dr. Rosewater formally requested it.[2] (Chalamala Decl. ¶ 4.) Dr. Hernandez acknowledged that after she was denied admission to the Sandia UPT Special Degree Program, she never requested to work part-time while she worked in ESTS. (Pl.'s Dep.

---

[2] The parties seem to dispute whether Dr. Schenkman was pursuing a doctorate and working part-time. Dr. Chalamala stated that Dr. Schenkman was never formally admitted into a Ph.D. program. Dr. Chalamala stated further that Dr. Schenkman neither requested nor received his approval to work part-time. (Chalamala Decl. ¶ 4.)

This fact is not material, but the Court will resolve this dispute in the light most favorable to Dr. Hernandez and assume that Dr. Schenkman was pursuing a doctorate and working part-time.

125:01-23; Chalamala Decl. ¶ 5.) Dr. Chalamala claimed that if Dr. Hernandez had requested to work part-time, then he would have granted this request. (Chalamala Decl. ¶ 5.)

### B.     Internal Audit and Ethics Investigation

In November 2019, Sandia's Internal Audit Department conducted a routine audit and identified that Dr. Hernandez requested and received double reimbursement for the same conference registration fee. (Pl.'s Dep. 145:12 to 147:02, 153:13 to 155:02; Audit Email 1, Def.'s Ex. F, ECF No. 26-2.) The auditor emailed Dr. Hernandez for an explanation. (Pl.'s Dep. 153:13 to 155:02.) After the auditor spoke with Dr. Hernandez, the auditor further examined Dr. Hernandez's conference trip. The auditor noticed some discrepancies: Dr. Hernandez flew to Phoenix on a Sunday, but the conference did not start until Tuesday; Dr. Hernandez flew home on Thursday, but she listed her last travel day as Friday; and Dr. Hernandez did not record any vacation time. The auditor notified Sandia's Ethics Department. (*Id.* at 157:21 to 158:02, 159:04 to 160:25; Recommendation for Ethics Email 1-2, Def.'s Ex. G, ECF No. 26-2.) Dr. Hernandez acknowledged that she has no evidence that the auditor referred her to the Ethics Department because of her race, color, age, or any other protected category. (Pl.'s Dep. 168:05 to 169:01.)

### 1.     Mr. Miller's Investigation

Beginning in January 2020, Sandia Ethics Investigator Michael Miller reviewed Dr. Hernandez's business travel from 2017 to 2019. Mr. Miller did not know and had never met Dr. Hernandez before the investigation. During the investigation, Mr. Miller had at least one phone call and at least two face-to-face meetings with Dr. Hernandez. (*Id.* at 173:17 to 174:07, 176:15 to 177:17, 178:17 to 180:08; Miller Decl. ¶¶ 1-2, Def.'s Ex. H, ECF No. 33-2.)

Dr. Chalamala met with Mr. Miller too. (Pl.'s Dep. 143:09-11, 186:11-14, 188:20-21.) After he did so and after Dr. Hernandez first met with Mr. Miller—according to Dr. Hernandez—

6

Dr. Chalamala advised Dr. Hernandez to tell Mr. Miller at their next meeting that "the investigation was race based." In addition, Dr. Hernandez testified that Dr. Chalamala dictated a letter for her to give to Mr. Miller, which she did.[3] (*Id.* at 185:18 to 189:17.) The letter reads, in part,

> You have questioned my integrity. I believe that it is because I am an African-American woman. I invited my Manager to our meeting because of your aggressive and confrontational tone toward me – that it feels like harassment. In an e-mail to me, you instructed me that my Manager was not invited to this type meeting. I will meet with you. But, please be aware that I am considering filing a formal complaint accordingly.

(Hernandez Letter to Mr. Miller 1, Def.'s Ex. I, ECF No. 26-2.)

In her deposition, Dr. Hernandez testified that Dr. Chalamala did not explain to her why he thought the investigation was racially motivated. (Pl.s' Dep. 195:05-11.) She also stated that Mr. Miller never made any derogatory statements or references to her race in their meetings. (*Id.* at 200:12-15.) And she acknowledged that she is unaware of anything in Mr. Miller's background or past or experiences with other employees that would suggest he has a bias against African American employees. (*Id.* at 202:14-18.)

Perhaps to the contrary, Dr. Hernandez testified that Mr. Miller spoke harshly to her.[4] (*Id.* at 200:01-11.) And in her declaration, Dr. Hernandez described Mr. Miller as "unnecessarily aggressive and adversely racially motivated to me during our first interview." (Pl.s Decl. ¶ 72.) Dr. Hernandez also asserts that she "invoked her right to have [her] manager present at the meeting" but that Mr. Miller did not allow Dr. Chalamala or anyone else to attend their meetings.[5]

---

[3] According to Sandia, Dr. Chalamala denies advising Dr. Hernandez to identify racial motivation. He also denies dictating the letter. (Def.'s Mem. Br. 6, ¶ 16 n.4.) For purposes of this motion, however, the Court will assume that Dr. Chalamala gave that advice and dictated the letter.

[4] It is unclear whether Dr. Hernandez accused Mr. Miller of speaking harshly at all their meetings or just the first one (and not the meeting where Dr. Hernandez gave Mr. Miller the letter).

[5] Dr. Hernandez's statement suggests a "right" to have her manager present. But she says nothing about the source of this "right" other than the following statement in her declaration: "Sandia's

(Pl.'s Dep. 188:12-13, 200:01-11; Hernandez Letter to Mr. Miller 1.) According to Dr. Hernandez, Dr. Chalamala's exclusion harmed her because Dr. Chalamala knew about the travel and contracts (described below) that alarmed Mr. Miller.

### 2. Alleged Conflict of Interest with ROJO Foto

During his investigation, Mr. Miller discovered what he called "a significant undisclosed personal conflict of interest." (Miller Decl. ¶ 3.) Dr. Hernandez's work included recommending and overseeing subcontractors. One subcontractor was ROJO Foto, a design-and-print company in Chicago. Mr. Miller asserted that Dr. Hernandez's daughter worked for ROJO Foto and that Dr. Hernandez communicated with her daughter about contract procurement. Mr. Miller further asserted that Dr. Hernandez did not reveal this conflict on her required annual disclosures. (*Id.*)

Dr. Hernandez disputes Mr. Miller's assertion that her daughter "worked for ROJO Foto." (Miller Decl. ¶ 3.) She also disputes that she violated any conflict-of-interests policy. (Pl.'s Resp. 5, ¶ 24.) She states that her daughter was not a ROJO Foto employee. (*Id.* at 3, ¶ 19.) But she agreed that her daughter "received financial benefits from her subcontract with ROJO Foto." (Pl.'s Dep. 52:12-14.) And Sandia's personal-conflicts-of-interest policy requires that employees

> [a]void or immediately report to immediate manager, and update [a disclosure] form to report a personal relationship with a supplier or *customer* that includes an *immediate family* member or other close personal relationship (e.g., present or past spouse, domestic partner, or close friend).

(Conflicts of Interest Policy 4, Def.'s Ex. M, ECF No. 26-2.) Dr. Hernandez acknowledged that this policy does not distinguish between employment and subcontracting. (Pl.'s Dep. 56:04-06.)

---

audit training indicates that members of the workforce have the right to have a manager present during an audit." (Pl.'s Decl. ¶ 73.) Dr. Hernandez has not offered a source—such as an employee handbook—proving that she had a right to managerial accompaniment at her meeting with Mr. Miller. Thus, the Court will assume neither the existence nor violation of such a right.

According to Dr. Hernandez, Mr. Miller asked Dr. Hernandez during one of their meetings to complete conflict-of-interest disclosures about her daughter. In Dr. Hernandez's memory, Mr. Miller told her that she would be immediately fired if she did not comply. Dr. Hernandez attested that she immediately completed the disclosure forms. (Pl.'s Decl. ¶¶ 61-62.)

Finally, after one of Dr. Hernandez and Mr. Miller's meetings, Dr. Hernandez asserts that Mr. Miller told her that she need not stop dealing with ROJO Foto. (*Id.* ¶ 63.) Thus, according to Dr. Hernandez, Sandia maintained its contract with ROJO Foto after Mr. Miller's investigation. (*Id.* ¶¶ 63-64.) Dr. Hernandez attests that she continued to participate in the work with ROJO Foto after the investigation and that Dr. Chalamala approved of this work. (*Id.* ¶ 64.)

### 3.    Alleged Business-Travel Fraud

Mr. Miller reviewed six business trips besides the one that Dr. Hernandez took to Phoenix. Most were to Chicago, purportedly to visit ROJO Foto. According to Mr. Miller, Dr. Hernandez often departed toward the end of the workweek, stayed through the weekend, and returned early the next week. In Mr. Miller's opinion, based on the work performed, Dr. Hernandez's travel could have been limited a workweek without a weekend stay. (Miller Decl. ¶ 4.)

Two Chicago trips stood out. After reviewing emails, Mr. Miller determined that Dr. Hernandez did not complete any Sandia work and only completed schoolwork during trips in November 2018 and August 2019. (*Id.* ¶ 5.) In addition, Mr. Miller learned that Dr. Hernandez's daughter lived in a Chicago suburb. When Dr. Hernandez traveled to Chicago—according to Mr. Miller—she stayed near her daughter's family and watched her grandchildren at her hotel during days that Dr. Hernandez expensed as workdays. Thus, Mr. Miller believed that Dr. Hernandez "arranged a contract with ROJO Foto to financially enrich her daughter and to give herself an excuse to travel to Chicago at Sandia's expense to visit her daughter and grandchildren." (*Id.* ¶ 6.)

Dr. Hernandez disputes that her travel was improper. Dr. Hernandez states that an administrative assistant scheduled all her travel. (Pl.'s Decl. ¶ 5(d).) And according to Dr. Hernandez, Dr. Chalamala approved all travel expenses, dates, ground transportation, and accommodation. (*Id.* ¶ 5.) Dr. Chalamala also gave his approval—Dr. Hernandez asserts—*after* Dr. Hernandez completed her travel and submitted her documentation. (*Id.* ¶ 5(a).) In addition, Dr. Hernandez attests that Dr. Chalamala allowed other employees to bring children to conferences. (*Id.* ¶¶ 60, 65.) Dr. Hernandez admits, however, that she did not tell Dr. Chalamala about her daughter's relationship with ROJO Foto before the ethics investigation. (Pl.'s Dep. 48:07 to 49:12.)

Dr. Hernandez also disputes the impropriety of the two Chicago trips—in November 2018 and August 2019—that Mr. Miller flagged. For the November 2018 trip, she writes that the trip was originally scheduled to New York, not Chicago. (Pl.'s Resp. 4, ¶ 21; Pl.'s Decl. ¶ 38). But after bad weather prevented her from reaching New York, Dr. Hernandez claims that she "asked [Dr. Chalamala] if [she] could go ahead and finish the . . . work with ROJO so that I would not have to make a second trip." (Pl.'s Decl. ¶ 41.) Dr. Hernandez attests that she completed Sandia work during that trip. (*Id.* ¶ 42.)

For the August 2019 trip, Dr. Hernandez seems to dispute Mr. Miller's conclusions by claiming that the trip was originally scheduled to Washington, D.C. (Pl.'s Resp. 4, ¶ 21.) But this rebuttal tracks with Mr. Miller's conclusions, because he too noted that the trip was originally scheduled to Washington, D.C. (Report of Investigation 12-13, Def.'s Ex. L, ECF No. 26-2.) One of Mr. Miller's issues with this trip was that Dr. Hernandez extended her travel to visit Chicago.

(*Id.*) Dr. Hernandez does not appear to dispute that she extended her trip to visit Chicago.[6] (Pl.'s Resp. 4-5, ¶ 21.) She does, however, cite two deliverables completed on this trip. (Pl.'s Decl. ¶ 47.)

Viewing all this in the light most favorable to Dr. Hernandez, the Court accepts that Dr. Hernandez took business trips to Chicago during her employment with Sandia, including in November 2018 and August 2019. The Court also accepts that Dr. Hernandez visited her family during these trips, although Dr. Chalamala's conduct suggests that he permitted other employees to spend time with family during business trips. Finally, the Court accepts that Dr. Hernandez completed at least some work for Sandia during these trips—but the Court takes no position on whether enough work was completed to justify the amount of travel.

### 4.     Mr. Miller's Conclusions

In April 2020, Mr. Miller submitted a twenty-one-page investigative report. (Report of Investigation 1.) All in all, Mr. Miller reviewed (1) trip information in Dr. Hernandez's expense reports from September 2017 to April 2020; (2) Dr. Hernandez's personal-conflicts-of-interest forms; (3) email, calendar, and associated documentation; and (4) contracts involving ROJO Foto. He also interviewed Dr. Hernandez, Dr. Chalamala, and two other witnesses. (*Id.* at 21.)

Mr. Miller concluded that Dr. Hernandez violated three Sandia policies: (1) the procurement policy, which "requires employees report any relationship with a supplier that could be perceived as a potential personal conflict of interest"; (2) the personal-conflicts-of-interest policy, which "requires employees to avoid or address actual or perceived personal conflicts of

---

[6] Dr. Hernandez asserts that Dr. Chalamala mandated her travel to Washington, D.C., and her travel to promote an energy-storage program. (Pl.'s Resp. 8-9, ¶¶ 46-47; Pl.'s Decl. ¶¶ 5(b), (c).) The Court will disregard these allegations as too general and conclusory. It is unclear, for example, whether Dr. Chalamala mandated Dr. Hernandez to reroute her November 2018 trip to Chicago after experiencing bad weather. So too, it is unclear whether Dr. Chalamala mandated Dr. Hernandez to extend her August 2019 travel to Washington, D.C., to also visit Chicago.

interest and to complete a Personal Conflict of Interest (PCI) form annually"; and (3) the travel-and-expense-report policy, which "requires that employees only incur expenses for business travel that are allowable and permissible, legitimate, necessary, reasonable, and directly related to accomplishing Sandia's mission, and *not* for personal use." (Def.'s Mem. Br. 9, ¶ 23, n.6 (quoting Report of Investigation 5-6).)

### 5.      Dr. Hernandez's Challenges to Mr. Miller's Investigation

Dr. Hernandez asserts that Mr. Miller's investigation suffered from several procedural deficiencies.

First, Dr. Hernandez gave Mr. Miller contact information for ROJO Foto and her daughter, but he never contacted them. (Pl.'s Decl. ¶ 61.)

Second, Dr. Hernandez contends that Mr. Miller "was not interested in the history or circumstances behind the hiring of ROJO Foto and why it was under the direction of my manager that we used ROJO Foto to satisfy the demands of our DOE Sponsor for energy storage outreach needs." (Pl.'s Resp. 9, ¶ 50.) This allegation is conclusory, so the Court will disregard it.

Third, Dr. Hernandez contends—based on her conflict-of-interest training—that if Sandia suspects a conflict of interest with a contract, then the supervising manager is supposed to review that contract. Because Mr. Miller rather than Dr. Chalamala (Dr. Hernandez's supervising manager) reviewed the ROJO Foto contract, Dr. Hernandez states that Mr. Miller's review diverged from Sandia's announced processes. (Pl.'s Resp. 2-3, ¶ 19; Pl.'s Decl. ¶ 62.)

Fourth, Dr. Hernandez brought Mr. Miller "a seven-page document and a box that contained each deliverable associated with each [business] trip." (Pl.'s Decl. ¶ 6A.) According to Dr. Hernandez, Mr. Miller refused to look at this material. (*Id.*)

Fifth, Mr. Miller did not allow Dr. Hernandez to review his investigative report for three months. (Pl.'s Decl. ¶ 2.) Because of this delay, Dr. Hernandez could not review the report before (as described next) Sandia gave her the choice between retirement and termination. (*Id.*)

### C.    Dr. Hernandez's Retirement Instead of Termination

The Sandia Ethics Department forwarded Mr. Miller's investigative report to the Sandia Corporate Review Committee ("CRC"). The CRC was an independent management body composed of three voting members: Dr. Adkins, Rob Nelson, and John Zepper. The CRC determined whether and how to discipline Dr. Hernandez for the alleged violations of Sandia's policy. (Adkins Decl. ¶¶ 2-3, Def.'s Ex. N, ECF No. 33-3.) Dr. Hernandez testified that she did not know Messrs. Nelson and Zepper. (Pl.'s Dep. 279:06-10, 280:11-25.) She also testified that she does not know whether Messrs. Nelson and Zepper knew her race. (*Id.* at 283:03 to 284:22.)

According to Dr. Adkins, the Sandia Human Resources Department provided the CRC with a list of comparable cases of employees who were found to have committed similar policy violations. One of those employees violated conflict-of-interest policies and was terminated; another committed business-travel fraud and was also terminated. Dr. Adkins recounted that the CRC considered the comparable cases and the severity of Dr. Hernandez's policy violations and recommended termination of Dr. Hernandez's employment.[7] (Adkins Decl. ¶ 4; Discipline Matrix, Def.'s Ex. O, ECF No. 26-2; Case Review & Approval Form, Def.'s Ex. P, ECF No. 26-2.)

---

[7] Dr. Hernandez states, "no facts are known or revealed by Defendant as to what made [the alleged comparable cases] comparable nor whether they are the entirety of comparable cases and hence there is no evidentiary foundation for this 'undisputed fact' and it should not be considered by the Court." (Pl.'s Resp. 6, ¶ 29.) The Court makes no determination as to whether the list of comparable cases in the Discipline Matrix is complete. Nor does the Court conclude that the comparable cases in the Discipline Matrix are perfect matches to Dr. Hernandez's case. All the Court accepts is that the CRC considered a list of cases that *the CRC* thought were analogous.

On June 16, 2020, Dr. Chalamala and a Human Resources representative, Patrick Trotier, met with Dr. Hernandez. According to Dr. Hernandez, Dr. Chalamala told her that she was terminated. (Pl.'s Decl. ¶ 77; Pl.'s Dep. 286:11 to 288:19.) Mr. Trotier interjected, "Hold just a second." Mr. Trotier then offered Dr. Hernandez the opportunity to retire and gave her forty-eight hours to exercise that option. (Pl.'s Dep. 286:11 to 288:19)

Dr. Hernandez chose retirement. (*Id.*; Pl.'s Decl. ¶ 77.) Dr. Hernandez testified that she made this choice because it "was the advice of counsel." (Pl.'s Dep. 288:19-22.) And she stated that retirement gave her "the opportunity to be part of the medical and dental benefits program, some funds out of pocket, as well as access to [her] pension." (*Id.* at 289:01-10.) Dr. Hernandez informed Mr. Trotier of her decision in an email dated June 17, 2020. (Hernandez Email to Trotier 1, Def.'s Ex. Q, ECF No. 26-2.)

### D.    Dr. Hernandez's EEOC Charge of Discrimination and This Action

On December 12, 2020, Dr. Hernandez filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Charge of Discrimination, 1.) She alleged discrimination based on race, color, and age. She wrote,

> There are about 25 employees in ESTS. From 2016 to 2020 there were 12 post-doc students. Ten of them were promoted by the employer, the other African American and I were not. I was terminated and the other left. We were the only Black employees in the department. I was the only doctoral student in my department at ESTS who had to be both a full-time employee and student. As far as I know, I was the only one of the 12 post-doc students over the age of 40.

(*Id.* at 2.)

Sandia contextualizes these allegations with two facts, which Dr. Hernandez does not dispute. First, Dr. Hernandez was not a postdoctoral appointee. Postdoctoral appointees are temporary student positions and not regular employees. By contrast, the other African American that Dr. Hernandez referenced, Alex Headley, was a postdoctoral appointee. (Pl.'s Dep. 30:07 to

31:18, 293:05-17, 294:05-18.) Second, Dr. Hernandez testified that she does not know whether Dr. Headley applied for any positions at Sandia following his postdoctoral appointment. In fact, a letter from Dr. Headley to Dr. Chalamala shows that Dr. Headley chose to end his postdoctoral appointment at Sandia because he got a job at the University of Memphis. Dr. Hernandez also acknowledged that Dr. Headley never told her that he felt discriminated against because of race. (*Id.* at 294:05 to 296:05, 299:05 to 302:17; Headley Letter, Def.'s Ex. S, ECF No. 26-2; Headley Email, Def.'s Ex. T, ECF No. 26-2.)

After the EEOC charge, Dr. Hernandez brought this action. She pled three claims: Count I for race and color discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1); Count II for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1); and Count III for race discrimination in violation of 42 U.S.C. § 1981.

## III.    DISREGARDED FACTS

The Court disregards Dr. Hernandez's Additional Facts 37-42. In these facts, Dr. Hernandez claims to be "the ONLY employee" who suffered various mistreatments. For example, in Additional Fact 37, she writes, "I was the ONLY employee in the group who was openly berated by my manager, Dr. Babu Chalamala, in front of colleagues at weekly department meetings and monthly thrust leader meetings and told that my work or input was inferior despite high marks on work performance for five consecutive years." (Pl.'s Resp. 7, ¶ 37.) This allegation does not describe a specific instance of beratement. It also asserts a negative—that no other employee was subject to beratement—without substantiation. Because this allegation is "conclusory and self-serving," the Court will disregard this allegation and others like it. *See Ellis*, 779 F.3d at 1201.

When Dr. Hernandez makes specific allegations that crystallize the general allegations in Additional Facts 37-42, the Court considers them. For example, in Additional Fact 39, Dr.

Hernandez generally describes an employee replacing her in ESTS to do energy-policy work. (Pl.'s Resp. 7, ¶ 37; Pl's Decl. ¶ 1, bullet 4.) Dr. Hernandez later particularized this allegation, so the Court accepted it above. (Pl.'s Resp. 2, ¶ 8; Pl.'s Decl. Second ¶ 75.)

## IV.   LEGAL ANALYSIS FOR CLAIMS OF RACE AND COLOR DISCRIMINATION

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e–2(a)(1). Section 1981 promises "[a]ll persons . . . the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . ." 42 U.S.C. § 1981(a). Because Dr. Hernandez employs the same factual allegations and legal arguments for her race- and color-discrimination claims, the Court will address these claims together.

A plaintiff may prove a violation of Title VII or Section 1981 with direct or circumstantial evidence of discrimination. *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1224 n.4, 1225 (10th Cir. 2000). Absent direct evidence, courts analyze discriminatory discharge claims under these statutes with *McDonnell Douglas*'s burden-shifting framework. *Crowe*, 649 F.3d at 1194 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 & n.3 (10th Cir. 1997). Sandia and Dr. Hernandez agree that there is no direct evidence of discrimination and *McDonnell Douglas* applies. (Def.'s Mem. Br. 15; Pl.'s Resp. 28.)

The three steps of *McDonnell Douglas* are these: "[T]he plaintiff must first establish a prima facie case of discrimination or retaliation. Then, the defendant may come forward with a legitimate, non-discriminatory or non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is

pretextual." *Crowe*, 649 F.3d at 1195; *see Adamson v. Multi-Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The Court holds that Dr. Hernandez fails to make a prima facie case. In the alternative, the Court holds that Dr. Hernandez fails to show that Sandia's rationale for offering her a choice between termination and retirement was pretextual. Thus, the Court will grant Sandia summary judgment on Dr. Hernandez's race- and color-discrimination claims.

### A.    No Prima Facie Case

To establish a prima facie case of race discrimination, a plaintiff must show that (1) she is a member of a racial minority, (2) she suffered an adverse employment action, and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Plotke v. White*, 405 F.3d 1092, 1099-1100 (10th Cir. 2005) (noting burden is not onerous). It is undisputed that Dr. Hernandez is a member of a racial minority, so she meets the first element. (Def.'s Mem. Br. 15.)

Skipping ahead, examples of how a plaintiff can satisfy the third element include "preferential treatment given to employees outside the protected class"; "in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees"; or "the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position." *Plotke*, 405 F.3d at 1101 (quoting *Chertkova v. Conn. Gen. Life. Ins.*, 92 F.3d 81, 91 (2d Cir. 1996)).

Dr. Hernandez points to Dr. Chalamala telling her that ESTS would pivot away from energy-policy work after she completed graduate school. Then Sandia hired a white man (Mr. McNamara) to do energy-policy work for ESTS around the time Dr. Hernandez finished her degree. (Pl.'s Resp. 15.) True enough, Mr. McNamara was a limited-term employee, and Dr. Hernandez testified that she would not have applied for a limited-term position. Still, ESTS's

continued interest in policy work and Sandia's decision to give this type of work to a white man raises a *de minimis* inference of discrimination. *See Plotke*, 405 F.3d at 1101-02.

Returning to the second element, however, Dr. Hernandez did not suffer an adverse employment action when Sandia gave her the choice between retirement and termination. She argues that this choice was a constructive discharge. (Pl.'s Resp. 14-15.) "A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004). But a choice "between resignation and termination is not necessarily a constructive discharge, unless the employee's decision is, for some reason, involuntary." *Id.* (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992)).

The totality of the circumstances shows whether a termination-or-resignation choice is voluntary. *See Parker*, 981 F.2d at 1162. These circumstances may include "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.* (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988)); *see also Becerra v. City of Farmington*, No. 18-cv-00501, 2021 WL 1200652, at *12 (D.N.M. Mar. 30, 2021).

Here, Dr. Hernandez has "not shown that the choice between resignation or facing termination caused her resignation to be submitted under duress and that she had no real choice." *Parker*, 981 F.2d 1159, 1162 (10th Cir. 1992). Sandia had adequate reasons to threaten Dr. Hernandez with termination if she did not retire. *See id.* at 1162 (holding employer-college had adequate reasons to threaten employee-chairperson with termination after employer discovered

18

that employee hired her underqualified daughter as an instructor). For example, Sandia believed that Dr. Hernandez violated its procurement, personal-conflicts-of-interest, and travel-and-expense-report policies. What is more, retirement gave Dr. Hernandez medical and dental benefits, some out-of-pocket funds, and access to her pension. *See, e.g.*, *Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995) (holding resignation voluntary when, among other factors, plaintiff "was given a choice of resignation with stock payment or without").

So too, Dr. Hernandez understood her choice. She testified that an attorney advised her to retire. *See, e.g.*, *Exum*, 389 F.3d at 1136 (holding resignation voluntary when, among other factors, plaintiff had legal counsel during disputes with employer); *Parker*, 981 F.2d at 1162 (same).

Sandia gave Dr. Hernandez forty-eight hours to decide. Courts have upheld similar timeframes as reasonable. *See, e.g.*, *Becerra*, 2021 WL 1200652, at *12 (holding a weekend to be enough time); *Moore v. Hernandez*, No. 02-cv-01445, 2004 WL 7337973, at *5 (D.N.M. Apr. 27, 2004) (holding that plaintiff received "a reasonable amount of time (two days) to consult his attorneys and reconsider the matter before his resignation became effective").

The only factor that is not apparent is whether Dr. Hernandez could select her date of resignation.[8] But courts have held resignations to be voluntary without this factor. *See, e.g.*, *Becerra*, 2021 WL 1200652, at *12 (not considering whether discharged plaintiff chose date of resignation); *Moore*, 2004 WL 7337973, at *5 (suggesting that a reasonable time to consider resignation substitutes for the opportunity to choose a date of resignation). Thus, this final factor does not stop the totality of the circumstances from showing voluntariness.

Because Dr. Hernandez's decision to retire was voluntary, she was neither constructively

---

[8] In Dr. Hernandez's email to Mr. Trotier informing him of her decision to retire, Dr. Hernandez suggested that Sandia had offered roughly twelve days for her to complete her retirement paperwork. (Hernandez Email to Trotier 1.)

discharged nor the recipient of an adverse employment action. And because Dr. Hernandez has failed to show an adverse employment action, it follows that she has failed to establish a prima facie case for discriminatory discharge. *See Exum*, 389 F.3d at 1136. As a result, the Court will grant Sandia's motion for summary judgment on the race- and color-discrimination claims.

### B.    Legitimate, Nondiscriminatory Reasons

Assume (contrary to the Court's first holding) that Dr. Hernandez made a prima facie case of race and color discrimination. Then Sandia would need to proffer a legitimate, nondiscriminatory reason for its employment actions. *See Aramburu*, 112, F.3d at 1398. Sandia highlights (1) Dr. Hernandez's double reimbursement for the same business trip; (2) the ethics investigation that determined that Dr. Hernandez violated Sandia's procurement, personal-conflicts-of-interest, and travel-and-expense-report policies; and (3) the independent CRC that recommended terminating Dr. Hernandez after comparing her violations to prior ones committed by other employees. (Pl.'s Mem. Br. 18-19.) These reasons for offering Dr. Hernandez a choice between resignation and termination are legitimate and nondiscriminatory. *See, e.g.*, *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 (10th Cir. 2007) (adopting district court's findings that employer offered a legitimate, nondiscriminatory reason for firing employee when employer believed that employee violated ethical policies).

### C.    No Showing of Pretext

Proceed with the analysis under the assumption (contrary to the Court's first holding) that Dr. Hernandez made a prima facie case. After Sandia's success at *McDonnell Douglas*'s second step, the burden would return to Dr. Hernandez to raise a genuine issue that Sandia's explanations were pretexts to conceal discrimination. *See id.* At this step, "the presumption of discrimination

established by the prima facie showing simply drops out of the picture." *Aramburu*, 112 F.3d at 1403 (quoting *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995)).

To show pretext, a plaintiff may point to "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer*, 493 F.3d at 1160 (quoting *Plotke*, 405 F.3d at 1102). Dr. Hernandez makes three arguments. All fail.

### 1.    The Propriety of Mr. Miller's Investigation

Dr. Hernandez asserts that Mr. Miller's investigation was flawed. She states that Mr. Miller (1) spoke harshly to her; (2) did not contact ROJO Foto and Dr. Hernandez's daughter after Dr. Hernandez provided contact information; (3) forbade Dr. Chalamala from attending Mr. Miller and Dr. Hernandez's meetings, even though Dr. Chalamala could have explained Dr. Hernandez's business travel and contract formation with ROJO Foto; and (4) ignored a seven-page document and a box of deliverables from Dr. Hernandez's business trips. (Pl.'s Resp. 12-20.) And she rebuts Mr. Miller's conclusion that Dr. Hernandez did not have an actual or perceived conflict of interest in her dealings with ROJO Foto. (*Id.* at 14-15.)

To begin, the Court will not review Mr. Miller's substantive conclusions. Courts must "examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (alteration in original) (*quoting Luster v. Vilsack*, 667 F.3d 1089, 1092 (10th Cir. 2011)). In short, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (alteration in original) (quoting *Luster*, 667 F.3d at at 1094).

To challenge Mr. Miller's honest belief and good faith in his investigative report, Dr. Hernandez cites this Court's opinion in *Tastan v. Los Alamos National Security, LLC*, No. 17-cv-00664, 2019 WL 2163991 (D.N.M. May 17, 2019). In particular, Dr. Hernandez quotes the Court's recognition that "[a] failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *Id.* at *9 (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014)). Although this general principle remains true, *Tastan* does not help Dr. Hernandez.

In *Tastan*, the Court held that an employer's investigation into the plaintiff-employee's misconduct lacked any inference of pretext where the employer interviewed five key witnesses, including the employee. *See id.* The Court analogized *Estate of Bassatt v. School District No. 1*, 775 F.3d 1233 (10th Cir. 2014). In *Estate of Bassatt*, the Tenth Circuit also recognized that an employer's investigation had no inference of pretext where the employer similarly interviewed key witnesses, including the plaintiff-employee. *See* 775 F.3d at 1240. Finally, the Court distinguished *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530 (10th Cir. 2014). In *Smothers*, the Tenth Circuit held an employer's investigation raised an inference of pretext where the employer did not solicit the plaintiff-employee's side of the story and instead credited the "one-sided information" of another employee that the plaintiff quarreled with. *See* 740 F.3d at 542.

The analysis in *Tastan* adheres to other Tenth Circuit cases. *Dewitt v. Southwestern Bell Telephone Co.* reflects the proposition that "an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'" 845 F.3d 1299, 1314 (10th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 488 (10th Cir. 2006)). And in *Swackhammer v. Sprint/United Mgmt. Co.*, an investigation revealed that the plaintiff-employee violated the employer's ethical policies

by creating potential or apparent conflicts of interest, engaging in business-travel fraud, and otherwise acting in ways that appeared improper. *See* 493 F.3d at 1164-65. The employer interviewed the employee during an investigation and then fired the employee. *Id.* at 1164. The employee argued that the investigation's evidence "was insufficient to support a good-faith belief that [the employee] 'actually engaged in misconduct.'" *Id.* at 1170. The Tenth Circuit dismissed this argument and relied on the employer's "testimony that it was the appearance of impropriety arising from the evidence that mattered most to him." *Id.* The Circuit concluded that the employee failed to raise a genuine issue of fact that the employer's explanation was pretextual. *See id.*

This case follows *Tastan*, *Estate of Bassatt*, *Dewitt*, *Swackhammer*, and many others. Mr. Miller conducted a four-month investigation and compiled a twenty-one-page investigative report. He had at least one phone call and two face-to-face meetings with Dr. Hernandez. He interviewed Dr. Chalamala and two other witnesses. And he reviewed Dr. Hernandez's expense reports and personal-conflicts-of-interest forms; emails, calendars, and associated documentation; and contracts involving ROJO Foto. At bottom, Dr. Hernandez's alleged procedural deficiencies fail to create a genuine issue over Mr. Miller's honest belief and good faith in his investigative report.

Finally, it was the CRC—not Mr. Miller—who recommend terminating Dr. Hernandez. The CRC did so after reviewing Mr. Miller's investigative report and comparing Dr. Hernandez's violations to prior ones committed by other employees. And Dr. Hernandez does not allege that *the CRC* lacked honest belief and good faith in their deliberation. In sum, Dr. Hernandez's allegations of procedural deficiencies raise no inference of pretext in Sandia's actions.

### 2.    Dr. Chalamala's Assertion of Racism

Dr. Hernandez next points to Dr. Chalamala's advice that she tell Mr. Miller that "the investigation was race based." Dr. Hernandez alleges that Dr. Chalamala gave her this advice after

23

Dr. Chalamala met with Mr. Miller. In addition, Dr. Hernandez highlights Dr. Chalamala's dictation of the letter that she gave to Mr. Miller. Recall that the letter reads, in part, "You have questioned my integrity. I believe that it is because I am an African-American woman."

But a third party's "subjective belief of discrimination is not sufficient to preclude summary judgment." *Aramburu*, 112 F.3d at 1407 n.7. In *Aramburu v. Boeing Co.*, a Mexican American plaintiff-employee offered evidence that three other Mexican American employees believed that their shared supervisor discriminated against them. *See id.* at 1407 & n.7. The *Aramburu* panel assumed as true the other employees' subjective beliefs. Even under this assumption, however, the panel held that the employees' beliefs did not show pretext. *Id.* at n.7.

*Jones v. Denver Post Corp.* is of a piece. 203 F.3d 748 (10th Cir. 2000), *abrogated on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 503 U.S. 101 (2002). The plaintiff-employee offered affidavits of other employees who stated that the employer subjected the plaintiff to disparate treatment. *See id.* at 756. Once again, more was needed for pretext: "[T]hese employees reference no particular incidents to support the charge. Without specific examples of unlawful discrimination, [plaintiff] cannot withstand a motion for summary judgment." *Id.*

So even if it is true that Dr. Chalamala advised Dr. Hernandez to tell Mr. Miller that the investigation was racially motivated, this fact is not enough to show pretext. Dr. Chalamala's advice suggests—at most—that Dr. Chalamala himself believed the investigation was racially motivated. Importantly, Dr. Hernandez testified that Dr. Chalamala did not explain to her why he thought the investigation was racially motivated. And Dr. Hernandez did not offer any evidence that Mr. Miller told Dr. Chalamala that the investigation was racially motivated. Nor did she otherwise explain the source of Dr. Chalamala's subjective belief.

To avoid the rule that a third party's subjective belief is not enough to show pretext, Dr. Hernandez tries to attribute Dr. Chalamala's statement to Sandia as an admission by a party opponent. (Pl.'s Resp. 3, ¶ 16 n.1, 19 (citing Fed. R. Evid. 801(d)(2))). But Dr. Hernandez offered no evidence that Dr. Chalamala was responsible for Mr. Miller's conclusions. Nor did Dr. Hernandez offer evidence that showed any involvement by Dr. Chalamala in the CRC's deliberation. Thus, Dr. Chalamala's statement is not attributable to Sandia. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) ("[A]n employee's statements are not attributable to her employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1208-09 (10th Cir. 2010))).

In sum, even if Dr. Chalamala did advise Dr. Hernandez to tell Mr. Miller that the investigation was racially motivated, and even if Dr. Chalamala dictated the letter to Dr. Hernandez, there still would be no indication of pretext.

### 3.    Comparison to Other Employees

Dr. Hernandez's third attempt of showing pretext comes from referencing other postdoctoral students at Sandia. She writes that from 2016 to 2020, Sandia employed twelve postdoctoral students. According to Dr. Hernandez, she and Dr. Headley were the only African Americans in this group. Also according to Dr. Hernandez, Sandia promoted the other ten student-employees—but not Dr. Hernandez and Dr. Headley.

But the facts show that Dr. Headley ended his postdoctoral appointment at Sandia because he got a job at the University of Memphis. And Dr. Hernandez acknowledges that "[s]ince filing this action, [she] has learned that the other African American did not seek a position at Sandia." (Pl.'s Resp. 17 n.7) Thus, the reference to the other postdoctoral students does not show pretext.

Finally, it is unclear whether Dr. Hernandez points to Sandia's employment of Mr. McNamara to do energy-policy work for ESTS as an indication of pretext. (Pl.'s Resp. 17.) If she does so, the Court would disagree that Mr. McNamara's hiring shows pretext. Dr. Chalamala's decision to continue energy-policy work in ESTS after telling Dr. Hernandez that ESTS was pivoting to research and development does not undermine Sandia's legitimate, nondiscriminatory reasons for its employment actions. Said otherwise, the Court sees no relationship between the subject of ESTS's work and the CRC's recommendation to terminate Dr. Hernandez.

In the end, Dr. Hernandez fails to show any indication of pretext in Sandia's actions. Thus, even if Dr. Hernandez made a prima facie case of discrimination, the Court would still grant Sandia summary judgment on the race- and color-discrimination claims.

**D.      Conclusion to Race and Color Discrimination**

Dr. Hernandez's claims of race and color discrimination fail for two reasons. First, Dr. Hernandez did not make a prima facie case of race and color discrimination. Second, Dr. Hernandez did not show that Sandia's legitimate, nondiscriminatory reasons for its employment actions were pretextual. For these alternative reasons, the Court grants Sandia summary judgment on the race- and color-discrimination claims.

**V.      LEGAL ANALYSIS FOR CLAIM OF AGE DISCRIMINATION**

Under the ADEA it is illegal for an employer to discriminate against any individual who is at least 40 years of age "because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). As with the race- and color-discrimination claims, the Court employs the *McDonnell Douglas* framework for age-discrimination claims under the ADEA. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Dr. Hernandez's theory of age discrimination seems to be that she worked full-time

while pursuing her graduate degree, but Sandia allowed two younger employees—Drs. Rosewater and Schenkman—to work part-time while pursuing their degrees. (Compl. ¶¶ 19-20, ECF No. 1-1; Pl.'s Resp. 19.)

Starting again with first step of *McDonnell Douglas*, Dr. Hernandez must make a prima facie case of age discrimination. She must show, "1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class." *Id.* at 1279 (alteration in original) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)). Sandia assumes that Dr. Hernandez satisfies the first, third, and fourth elements of her prima face case. (Def.'s Mem. Br. 22.)

But Sandia contends—and the Court agrees—that Dr. Hernandez cannot show that she suffered an adverse employment action. "[A]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hiatt v. Colo.* (quoting *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)).

Dr. Hernandez did not request to work part-time after she was denied admission in the Sandia UPT Special Degree Program.[9] Drs. Rosewater and Schenkman, by contrast, requested part-time work. And Dr. Chalamala testified that had Dr. Hernandez requested to work part-time, he would have granted that request. Any differential treatment, therefore, came from Dr.

---

[9] Dr. Hernandez does not argue that her exclusion from the Sandia UPT Special Degree Program was discriminatory. Instead, she argues only that she was subject to age discrimination because younger employees were allowed to work part-time while she continued to work full-time. (Pl.'s Resp. 19; Compl. ¶¶ 19-21.) Any argument about how Sandia admits employees into its UPT Special Degree Program is therefore waived. *See Trans-W. Petroleum, Inc. v. U.S. Gypsum Co.*, 830 F.3d 1171, 1175-76 (10th Cir. 2016).

Hernandez's voluntary choice—not any adverse employment action. *Cf. Walker v. Answer Topeka, Inc.*, No. 20-cv-02049, 2021 WL 2443890, at *8 (D. Kan. June 15, 2021) (holding no adverse employment action where plaintiff-employee was hired for full-time position, requested and received approval to work part-time, and then complained that other employees worked full-time).

Dr. Hernandez seems to blame Dr. Chalamala for her full-time work. After conceding that she never requested part-time work, Dr. Hernandez states, "Dr. Chalamala was the individual that would be required to request the part-time status and he never offered the opportunity to [Dr. Hernandez]." (Pl.'s Resp. 19.) But Dr. Hernandez provides no authority suggesting that Dr. Chalamala needed to expect that Dr. Hernandez wanted to work part-time and offer her the opportunity to reduce her hours.

In short, Dr. Hernandez fails to show any adverse employment action. She thus fails to make a prima facie case of age discrimination.[10] The Court grants Sandia's motion for summary judgment on Dr. Hernandez's age-discrimination claims.

---

[10] Dr. Hernandez returns to Mr. McNamara's policy work for ESTS as an indicator of pretext. (Pl.'s Resp. 20.) Because Dr. Hernandez has not shown any adverse employment action due to age discrimination, however, the second and third steps of *McDonnell Douglas* were not reached.

Even if Dr. Hernandez had made a prima facie case of age discrimination, then Sandia proffered a legitimate, nondiscriminatory reason why the younger employees worked part-time while Dr. Hernandez worked full-time: they requested to do so, and she did not. *Cf. Harris v. Burger King Corp.*, 993 F. Supp. 2d 677, 685 (W.D. Ky. 2014) (holding that employer had a legitimate, nondiscriminatory reason for difference in employees' hours when "this other employee requested the additional hours").

Then, at step three of *McDonnell Douglas*, ESTS's continued policy work—and decision to hire Mr. McNamara—would not show any pretext in Sandia's explanation for the hours differential between Dr. Hernandez and her younger colleagues. The Court sees no relationship between ESTS hiring Mr. McNamara and Dr. Hernandez continuing to work full-time after not requesting to work part-time.

## VI.     CONCLUSION

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that *Defendant's Motion for Summary Judgment* (**ECF No. 26**) is **GRANTED**. Plaintiff Jacquelynne Hernandez's claims, and thus this case, are **DISMISSED WITH PREJUDICE**.

_____
SENIOR UNITED STATES DISTRICT JUDGE